**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**NINTENDO OF AMERICA INC.**

    *Plaintiff*,

    v.

**TOM DILTS, JR.**

    and

**UBERCHIPS, LLC, d/b/a UBERCHIPS.COM**

    *Defendants*.

CIVIL ACTION NO. _____

**JURY DEMAND**

## COMPLAINT

Plaintiff Nintendo of America Inc., by and through its counsel, on personal knowledge as to its own actions and on information and belief as to the actions, capabilities, and motivations of others, hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      Nintendo of America Inc.—along with its parent, Nintendo Co., Ltd., collectively referred to as "Nintendo"—develops and distributes the Nintendo Switch, one of the most popular video game consoles of all time, as well as the proprietary and copyrighted software that serves as Nintendo Switch's operating system.  Nintendo also makes award-winning video games that can be played only on the Nintendo Switch.  To protect its intellectual property against video game piracy, and to ensure that only authorized and licensed Nintendo Switch games can be played on the Nintendo Switch, Nintendo designed the Nintendo Switch with sophisticated security features meant to prevent unauthorized operating systems from being used

on the Nintendo Switch, and to prevent pirated video games from being playable on the Nintendo Switch.

2.      Tom Dilts, Jr. and Uberchips, LLC (together, "Defendants") operate a website at UBERCHIPS.COM through which they offer devices to the public, the sole purpose of which is to hack the Nintendo Switch video game console in order to allow people to play pirated video games.

3.      Specifically, Defendants' website sells products from an anonymous group of hackers called "Team Xecuter."  Team Xecuter unlawfully designs and manufactures an unauthorized operating system ("OS") called the "SX OS," and accompanying piracy tools that install it (the "Circumvention Devices").  The Circumvention Devices—offered, distributed, and trafficked by Defendants—strip away or circumvent technological protection measures (the "Technological Measures") that Nintendo put into place to protect its invaluable copyrighted software and video games from unauthorized access and copying.  The sole purpose of the Circumvention Devices and the SX OS is to hijack the Nintendo Switch by circumventing its Technological Measures, thereby allowing the Nintendo Switch to be used for massive intellectual property theft and infringement.

4.      Once this circumvention has occurred, the SX OS can run on the Nintendo Switch, modifying the authentic, authorized Nintendo Switch operating system, thereby allowing users to bypass the Technological Measures to obtain and play virtually any pirated game made for the Nintendo Switch, all without authorization or paying a dime to Nintendo or to any of the large number of authorized game publishers making games for Nintendo Switch.  For example, with the SX OS running, users can find pirated Nintendo Switch games online, transfer unauthorized copies of Nintendo Switch games to a memory card, insert that card into the Nintendo Switch, and play those infringing games on the hacked Nintendo Switch.  If users

already own a *lawful*, properly purchased copy of a Nintendo Switch game, they can use the SX OS to turn that lawful copy into an *unlawful* copy without technological protection measures, which then allows those users to share additional unauthorized copies with more users also using the SX OS on the Nintendo Switch.

5.     Team Xecuter has been trafficking in devices that circumvent protections on the Nintendo Switch since May 2018, when they released the "SX Pro," a small piece of hardware (or "dongle") that can be inserted into the Nintendo Switch.  Once the dongle is inserted into the Nintendo Switch console, the console can operate SX OS (which the user inserts with a separate memory card), thereby allowing users to circumvent the Nintendo Switch's Technological Measures, and copy, share, distribute, and use pirated games.

6.     In June 2018, after experiencing the tremendous harm caused by Team Xecuter and other third parties' sales of the SX Pro—as well as the SX Pro's users hacking into Nintendo Switch consoles to play and distribute pirated games—Nintendo released a technical update of the Nintendo Switch with updated hardware to prevent the console from being hacked by the SX Pro.  As such, the SX Pro is not capable of hacking any post-June 2018 Nintendo Switch consoles.

7.     In late 2019, Nintendo released a new version of the Nintendo Switch with better battery life, and introduced a new console, the Nintendo Switch Lite, which runs all the same games as the Nintendo Switch, but is smaller and can only be played as a handheld device.[1] Since June 2018, Nintendo has sold over 35 million additional Nintendo Switch and Nintendo Switch Lite consoles, which are not currently hackable by the SX Pro.

---

[1] References to the Nintendo Switch herein include both the Nintendo Switch and the Nintendo Switch Lite, unless a distinction is drawn in the text.

8.     However, that is all about to change.  On December 28, 2019, Team Xecuter posted a video to their blog, TEAM-XECUTER.COM, showing the SX OS purportedly running on a Nintendo Switch Lite, thus demonstrating that they have developed new Circumvention Devices that can circumvent the Technological Measures on the Nintendo Switch Lite and on the post-June 2018 Nintendo Switch consoles (which contain the same Technological Measures as the Nintendo Switch Lite).  They captioned the video by boasting about their unlawful conduct: "We rocked the Switch in 2019 and with the year soon over, here is a little teaser of one of the things to come early 2020!  Enjoy!"

9.     Staying true to their year-end promise, on April 7, 2020, Team Xecuter announced that preorders were available—through Defendants, among others—for the two new Circumvention Devices, which they call "SX Core" and "SX Lite."[2]  SX Core is designed to hack the Nintendo Switch consoles, including the millions of post-June 2018 Nintendo Switch consoles, as well as those already hackable by the SX Pro; SX Lite is designed to hack the Nintendo Switch Lite.  Together, these new Circumvention Devices threaten to expose more than 35 million additional Nintendo Switch consoles and Nintendo Switch Lite handheld devices to piracy.  And on May 6, 2020, Team Xecuter announced that they had shipped all samples of the SX Core and the SX Lite to reviewers, and that "just for May [they] have already large stocks ready to ship."

10.     Team Xecuter does not sell or ship its Circumvention Devices directly to customers.  Rather, the Circumvention Devices are trafficked by "authorized resellers," including Defendants.  Defendants are currently offering preorders for both the SX Core and the SX Lite and will ship them to the United States or Canada.

---

[2] As used from herein on, "Circumvention Devices" refers to the SX Core and SX Lite—which Defendants sell—and not to the SX Pro, unless otherwise noted.

11.     UBERCHIPS.COM has been so popular that within a day of going online, the website sold out of "Batch #1" of its preorders.  On a Facebook account for Uberchips, Defendants stated that those with order numbers "342 and below" were part of the first batch, suggesting that at least 342 individuals had bought one or multiple Circumvention Devices from Defendants' site in just a single day.  Defendants then released "Batch #2"—of an unknown quantity—which sold out two and a half weeks later.  Defendants are now offering preorders in "Batch #3," their "final pre-order batch."  "Don't miss out," Defendants said on May 6, 2020, "get your pre-order in today."

12.     Nintendo placed a successful preorder purchase on UBERCHIPS.COM for both SX Core and SX Lite, received confirmation for that order, and payment has been processed.

13.     This unlawful conduct is causing and will continue to cause Nintendo tremendous harm.  Nintendo's copyrighted games are at the heart of its popularity.  For instance, *The Legend of Zelda: Breath of the Wild*, one of the first games released on the Nintendo Switch, has been called a "masterpiece" and "one of the greatest video games of all time."  Fans across the country and across the world return to Nintendo time and time again to purchase new games and to reconnect with some of the world's most iconic video game characters, such as Mario and Donkey Kong.

14.     As such, Nintendo's business necessarily relies upon the authorized and licensed sale of authentic copies of video games, and upon the trust it has built over decades from third-party game developers that the games they develop will be secure on Nintendo's consoles and will not be illegally distributed and played.

15.     This is exactly why Nintendo has invested and continues to invest in its Technological Measures to secure its consoles and copyrighted games, and to ensure users cannot use its consoles to play pirated games.

16.     Recognizing the threats faced by copyright owners like Nintendo in the age of digital piracy, Congress enacted legislation specifically designed to encourage copyright owners to employ technological measures to protect against piracy, and to punish those who traffic in devices designed to circumvent those measures.  In 1998, Congress passed the Anti-Circumvention and Anti-Trafficking provisions of the Digital Millennium Copyright Act ("DMCA"), making it illegal to circumvent—or traffic in devices that circumvent—technological protections put into place to protect against unlawful access to and copying of copyrighted works.

17.     Defendants' unlawful conduct falls squarely within these provisions.  The SX Core and SX Lite now available for preorder deactivate the Technological Measures—which Nintendo put in place to protect its copyrighted works from unlawful access and copying—thereby enabling, and exacerbating, widespread piracy.

18.     Defendants' importation, marketing, sale, offering to the public, and/or trafficking in the Circumvention Devices has directly injured and damaged Nintendo, infringes and threatens irreparable injury to Nintendo's intellectual property rights, and violates the Anti-Trafficking provisions of the DMCA, 17 U.S.C. § 1201 *et seq*., entitling Nintendo to the relief sought herein.

19.     The harm to Nintendo is manifest and irreparable.

20.     Without the intervention of this Court, Defendants will continue to engage in their illegal conduct in this District and the United States undeterred and without accountability or punishment, causing continued manifest and irreparable harm to Nintendo.

## NATURE OF THE ACTION

21.     This is a civil action seeking equitable relief and damages for unlawful trafficking in circumvention devices in violation of the DMCA, 17 U.S.C. § 1201 *et seq.*

## JURISDICTION AND VENUE

22.     This Court has original jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1338(a), and 17 U.S.C. §§ 1201 & 1203.

23.     This Court has personal jurisdiction over Uberchips, LLC because it does

continuous and systematic business in this District.  Moreover, the registration address and the

principal place of business for Uberchips, LLC is in Kenton, Ohio, within this District.  Ohio

Rev. Code Ann. § 2307.382; Federal Rule of Civil Procedure 4(k)(1).

24.     On information and belief, Defendant Tom Dilts, Jr. is a resident of Kenton, Ohio.

This Court has personal jurisdiction over Mr. Dilts because he is a resident of the State of Ohio

and his misconduct occurred in and caused harm in this District.

25.     On information and belief, Mr. Dilts is the founder and managing member of

Uberchips, LLC.  Mr. Dilts is the only member and agent listed in the LLC registration for

Uberchips, LLC filed with the Ohio Secretary of State.  In addition, the address contained in the

LLC registration for Uberchips, LLC matches Mr. Dilts' residence.

26.     Investigation has revealed that the UBERCHIPS.COM site is operated by an

individual who also uses the alias "GameOver."  Based on public records, Mr. Dilts' automobile

contains a vanity license plate reading "G4MEOVR."  On information and belief, Mr. Dilts is the

operator of UBERCHIPS.COM, under the alias "GameOver."

27.     On information and belief, Mr. Dilts directed Uberchips, LLC to engage in its

infringing conduct, and, as sole agent and listed member, he is the individual who has, on

information and belief, the decision-making power to start, stop, or continue the infringing

conduct.  Mr. Dilts exerts domination and control over Uberchips, LLC, which is used as a mere

shell for Mr. Dilts' actions.  Additionally, on information and belief, Uberchips, LLC is

inadequately capitalized and operates out of Mr. Dilts' residence.

28.     Defendants have specifically marketed, offered to the public, and otherwise trafficked in the Circumvention Devices in the United States and in this District.  Nintendo's claims arise out of and relate to Defendants' activities in this District.

29.     Indeed, Nintendo has placed a successful preorder purchase with Defendants' website UBERCHIPS.COM.  On information and belief, Defendants have accepted, confirmed, and processed payments for hundreds of other preorders for the SX Core and SX Lite.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and/or 28 U.S.C. § 1400(a) because the Defendants are an entity and an individual who reside and are domiciled in this District.

## THE PARTIES

31.     Nintendo of America Inc. is a Washington corporation headquartered in Redmond, Washington.  Nintendo of America Inc. is a wholly-owned subsidiary of Nintendo Co., Ltd., a Japanese company headquartered in Kyoto, Japan (collectively, Nintendo of America Inc. and Nintendo Co., Ltd. are referred to herein as "Nintendo").  Nintendo of America Inc. is responsible for the marketing and sale of Nintendo's products, and the enforcement of Nintendo's intellectual property rights, in the United States.  Nintendo Co., Ltd. develops, and Nintendo of America Inc. markets and distributes, electronic video game consoles, games, and accessories.

32.     On information and belief, Defendant Tom Dilts, Jr. is an individual who resides and is domiciled in Kenton, Ohio.

33.     On information and belief, Uberchips, LLC is a limited liability company organized under the laws of the State of Ohio, with a principal place of business in Kenton, Ohio. Its sole member and listed agent is Tom Dilts, Jr.

8

34.     Defendants operate the website UBERCHIPS.COM, through which they offer to the public, sell, and otherwise traffic in the Circumvention Devices, the sole purpose of which is to hack Nintendo's video game consoles in order to allow people to play pirated games. Defendants' acts facilitate infringement of numerous of Nintendo's copyrighted works on a massive national and international scale.

35.     Defendants currently offer to the public presales of Team Xecuter's SX Core and SX Lite, selling them for $45.95 per device.

**FACTUAL BACKGROUND**

36.     Nintendo is a company and brand famous throughout the United States and the world, known by consumers of all ages for its video games, video game consoles, and video game characters.

37.     For decades, Nintendo has been a leading developer and producer of video games and video game consoles.  In 1983, Nintendo released the Family Computer in Japan and, in 1985, Nintendo released the Nintendo Entertainment System, or "NES," in the United States, which introduced millions of consumers to now-classic games like Super Mario Bros., The Legend of Zelda, and Donkey Kong.  The NES console also introduced millions of consumers to some of Nintendo's original and long-lasting characters, including Mario and Luigi, Yoshi, Link, Donkey Kong, and Samus Aran.  Over the ensuing decades, Nintendo followed up the popularity of the NES console with the release of such groundbreaking home video game consoles as Super Nintendo Entertainment System, Nintendo 64, Nintendo GameCube, Wii, Wii U, and the Nintendo Switch.

38.     In addition to its home video game consoles, Nintendo has long been a market leader in handheld video game consoles.  In 1989, Nintendo released Game Boy, the first portable, handheld video game console to use interchangeable video game cartridges.  The Game

9

Boy family of consoles is one of the most popular video game consoles ever released, and introduced consumers to landmark games like Tetris, Kirby's Dream Land, and Pokémon. Nintendo has continued to lead the video game industry in the design and development of handheld video game consoles and games developed for those consoles, including Game Boy Color, Game Boy Advance, Nintendo DS, Nintendo 3DS, Nintendo Switch, and recently, the Nintendo Switch Lite (a form of the Nintendo Switch dedicated to handheld play).  Since 1983, Nintendo has sold more than 4.7 billion video games and more than 750 million hardware units globally.  Sales of Nintendo Switch alone have topped 55 million, and the top 5 Nintendo-developed copyrighted Nintendo Switch games have sold over 17 million copies each, rising above 95 million sales total.

39.     Nintendo has built its company through substantial creative and financial investment in the development of new consoles, video games, products, technological security protections, intellectual property, as well as in marketing.  Nintendo has garnered significant consumer awareness and goodwill through its commitment to developing and delivering innovative, fun, and memorable video game consoles and games.  Nintendo's video games are creative, audiovisual works with detailed stories, characters, and elements that are wholly original to Nintendo and protected by the Copyright Act.  Nintendo's video game consoles and games are enjoyed by tens of millions of consumers in the United States and abroad.

40.     Nintendo has made substantial investments in the development, marketing, and promotion of its innovative products and services.  Nintendo has acquired intellectual property and has authorized licensees who create and publish many popular video games made specifically and exclusively for play on Nintendo's video game consoles.

41.     The popularity of Nintendo's video games and video game consoles has made Nintendo the target of intellectual property pirates who benefit from Nintendo's innovation and

investment by making unauthorized copies of Nintendo's video games, or by creating (and selling) the means by which others can play pirated copies of Nintendo's video games on a Nintendo console.

42.     Illegal copying, or piracy, of video game software has become a rapidly worsening international problem.  Nintendo has taken many steps and expended significant resources to halt the illegal copying, marketing, sale, and distribution of Nintendo's video games (or games made by other Nintendo-authorized licensees) designed to be played on Nintendo's video game consoles, and to halt the illegal trafficking in devices that allow users to play unauthorized copies of games on Nintendo's video game consoles.

43.     Nintendo's efforts have included the implementation of a variety of measures to protect and control access to its copyrighted works.  Among these are technological security protections in Nintendo's video game consoles that prevent the unauthorized access to and copying of Nintendo's copyrighted works, and prevent the unauthorized play of pirated games on the console.

### The Nintendo Switch's Technological Measures Protect the Nintendo Switch Against Piracy

44.     In March 2017, Nintendo released a new console called the Nintendo Switch, a home video game console that can also be played "on the go" as a handheld console.  It quickly sold out in stores across the country and around the world, and, in the over three years since, has become one of the best-selling video game consoles of all time, selling over 55 million units worldwide.

45.     As a result, the top five Nintendo-developed games released for the Nintendo Switch alone have sold more than 95 million copies as of March 2020, and individually each title has sold over 17 million copies.  These games, as well as others produced by Nintendo, are

subject to valid, registered copyrights either owned by Nintendo or exclusively licensed by Nintendo.

46.     Like other Nintendo video game consoles, the Nintendo Switch contains numerous Technological Measures designed to prevent unauthorized access to the console and games, the bypassing or impairing of Nintendo's copyrighted operating system, and the unauthorized copying, playing, and sharing of games.

47.     For example, each Nintendo Switch contains an encrypted identifier, or "signature," that is checked when the console boots.  The operating system itself also contains Technological Measures designed to ensure the operating system is authorized.  Only if the operating system Technological Measures, including the encrypted signatures, are confirmed as authentic—thus proving the console and operating system are authorized by Nintendo—will the Nintendo Switch start up normally.

48.     The console's data as well as the game data—whether stored on the Nintendo Switch's built-in flash memory or on a removable flash memory card inserted into the console—is also encrypted with a key unique to each Nintendo Switch console.

49.     In addition, when the Nintendo Switch attempts to connect with Nintendo's servers (which happens when a user attempts to play online, to purchase games, or to download updates), those servers will check the console certificate.  Users are only able to access Nintendo's online services if this check is successful.  Nintendo also has the capability of banning specific user accounts or specific consoles from Nintendo's networks, should its authentication measures detect unauthorized use.

50.     In addition to the Technological Measures related to the console and the operating system, the Nintendo Switch also contains additional Technological Measures that verify each

*game* played on the Nintendo Switch (the "Game TPMs").  The Game TPMs employ encryption and signature checks similar to that of the Nintendo Switch's operating system described above.

51.      The Nintendo Switch allows users either to purchase physical cartridges with games on them that are inserted into the console, or to download digital games from Nintendo's own online store while using the Nintendo Switch.  Both formats are protected by encryption as well.

52.      Nintendo owns or exclusively controls numerous copyrights in software and games that are protected from unlawful access and copying by the operation of these Technological Measures.

53.      In their ordinary course of operation, the Technological Measures require the application of information and a process, with the authority of Nintendo, to gain access to Nintendo's copyrighted works, and thus effectively control access to and copying of Nintendo's copyrighted works.

### *Circumvention Devices and the SX OS*

54.      On or about May 16, 2018, Team Xecuter publicly announced their creation of the SX OS, an unauthorized operating system that can be installed only on the Nintendo Switch. To run the SX OS on the Nintendo Switch, Team Xecuter offers several circumvention devices that directly circumvent the Nintendo Switch's Technological Measures, which control access to the console and to Nintendo Switch's copyrighted works.  Once it is running, the SX OS continues to circumvent Game TPMs, thereby allowing users to play pirated games, and otherwise operate and manipulate the console without Nintendo detecting the circumvention, harming Nintendo's business and decreasing revenues from Nintendo's copyrighted works.

55.      Team Xecuter regularly releases updates for SX OS, including to accommodate changes Nintendo periodically makes to its firmware.  Recently, on April 23, 2020, Team

Xecuter released such an update, boasting that they had upgraded the local multiplayer functionality to "help with newer games like Animal Crossing."  Animal Crossing is a blockbuster Nintendo game released in March 2020.

56.     Of the circumvention devices that install the SX OS, the most relevant here are Team Xecuter's newest devices, the "SX Core" and the "SX Lite," which are available for preorder on Defendants' website.  Images on Team Xecuter's website show that the device is a hardware chip—or "modchip"—which is installed inside the casing of the Nintendo Switch after essentially breaking open the casing.  Below are true and correct copies of images taken on April 17, 2020 from TEAM-XECUTER.COM.





57.     On information and belief, the Circumvention Devices interfere with the normal operation of the Nintendo Switch to interrupt and bypass the Nintendo Switch's sequence of security checks and force the Nintendo Switch to run Team Xecuter's code.  Using that unauthorized code, the Circumvention Devices modify the Nintendo Switch's official operating

system—in which Nintendo owns or exclusively controls copyrights—to, among other things, retrieve the encryption keys necessary to access the encrypted data on the Nintendo Switch.

58.     On information and belief, the Nintendo Switch console then loads and runs the SX OS, modifying the authorized Nintendo Switch operating system.  Because the SX OS at that point has full control of the console and can run additional unauthorized code, the SX OS allows for the circumvention of Nintendo's additional Game TPMs and for infringement of Nintendo's copyrighted games.  Defendants' sales of Circumvention Devices also include software license keys for SX OS, necessary to activate the SX OS, and Defendants thus also traffic unlawfully in an important component of the SX OS.

59.     In June 2018, after experiencing the tremendous harm caused by Team Xecuter and other third parties' sales of the SX Pro, as well as the SX Pro's users hacking into Nintendo Switch consoles to play and distribute pirated games, Nintendo released a technical update of the Nintendo Switch with updated hardware to prevent the console from being hacked by the SX Pro.  As such, the SX Pro is not capable of hacking any post-June 2018 Nintendo Switch consoles.

60.     Defendants have boasted that these newer Circumvention Devices—SX Core and SX Lite—work on "ALL Nintendo [S]witch models," including the post-June 2018 Nintendo Switch consoles.  In other words, the modchips work on all over 35 million currently-unhackable Nintendo Switch and Nintendo Switch Lite consoles (and on over 55 million consoles in total).

61.     Team Xecuter, who acts in concert with Defendants, has also stated that SX Core works "for all regular Switch models . . . [including] unpatched Switches as well as patched and Mariko,"[3] and that SX Lite is designed "for Switch LITE."  In fact, Team Xecuter released a

---

[3] "Mariko" refers to the most recent version of the Nintendo Switch, which is not vulnerable to the SX Pro.

video on December 28, 2019 on its blog, TEAM-XECUTER.COM, showing the unauthorized

SX OS working on a Nintendo Switch Lite, proving that device had been hacked.



62.  Most recently, on May 6, 2020, Team Xecuter announced that they had shipped

samples of the SX Core and SX Lite to reviewers, and that "just for May [they] have already

large stocks ready to ship."  They further announced that if customers "are not comfortable with

soldering"—that is, using melted metal to connect electronic components—there would be

"installer[s] near you to . . . install it for you."

63.  The SX Core and SX Lite circumvent the Nintendo Switch's Technological

Measures, because otherwise the unauthorized SX OS could not be run on the console.

64.  Defendants' website currently is taking preorders for these forthcoming

Circumvention Devices.

***The Circumvention Devices and SX OS Enable Unlawful Copying by the
Circumvention of the Technological Measures, Including Game TPMs***

65.     In addition to the circumvention of the Technological Measures set forth above,

the SX OS also circumvents certain Game TPMs, thus allowing hackers to copy, play, and

further distribute unauthorized copies of Nintendo and its licensees' copyrighted video games, all

without detection by Nintendo, as follows:

66.     At a basic level, the SX OS—installable with the Circumvention Devices that

Defendants traffic in—allows users to play pirated games.  Using the SX OS, users can simply

find an illegal game file online—such as through a torrent site (a peer-to-peer file-sharing

website), where one might also go for pirated movies or music—and transfer it to the Nintendo

Switch.  The SX OS allows these illegal game copies to run locally, even though Nintendo's

official operating system would of course not allow a user to run such illegal and unauthorized

copies.  But the SX OS provides a number of other ways to unlawfully access and copy

copyrighted works, including by allowing users to connect their consoles to servers full of

infringing games.  Immediately below is an image of SX OS running, showing a gallery of

installable pirated games:



67. Nintendo has not authorized users to download or play any games on the Nintendo Switch that were not purchased lawfully.

68. Each use of these features, and others not enumerated here—which allow users to make, use, share, or distribute pirated games—causes financial harm to Nintendo. Indeed, with their preorders confirmed by Defendants, users know that they will be able to play pirated games and thus are less likely to purchase lawful games from Nintendo.

69. The SX Core and SX Lite, as well as the SX OS, are each a technology, product, service, device, component, or part thereof that are capable of circumventing and in fact do circumvent both access and copy protections on the Nintendo Switch.

70. Nintendo has never authorized Defendants, Team Xecuter, nor any of the users of the Circumvention Devices to use SX OS or the Circumvention Devices in connection with the Nintendo Switch, to circumvent the Nintendo Switch's Technological Measures, or to gain access to Nintendo's copyrighted works or copy those works in this unauthorized manner.

### *Defendants' Trafficking in the Unlawful Circumvention Devices*

71. Defendants operate UBERCHIPS.COM and traffic in the Circumvention Devices in violation of the Anti-Trafficking provisions of the DMCA.

72. UBERCHIPS.COM bills itself as "a USA based reseller for Team Xecuter," and boasts about an "upcoming Grand Opening event." The Circumvention Devices, Defendants say, "will enable you to use [custom firmware] on your Nintendo Switch."

73. In fact, UBERCHIPS.COM is not only one of Team Xecuter's "authorized resellers," but also is the sole website that has a large banner advertisement at the top of every page of Team Xecuter's blog TEAM-XECUTER.COM. True and correct screenshots of that banner advertisement, collected on May 7, 2020, are immediately below.







74.     As noted, Defendants are accepting preorders and processing payments for the SX Core and the SX Lite.

75.     Nintendo has placed successful test purchases on UBERCHIPS.COM for both the SX Core and the SX Lite, and has received email confirmation and had its payment processed. On information and belief, Defendants have accepted and confirmed hundreds of other preorders for the SX Core and the SX Lite throughout the United States, and plan to ship the products to purchasers when they become available, which is expected imminently.  Indeed, Defendants have explicitly stated as much: "[i]tems will be shipped as soon as they arrive and are processed through our warehouse."

76.     Trafficking in the Circumvention Devices and SX OS are direct violations of Nintendo's rights under 17 U.S.C. §§ 1201 & 1203, regardless of whether a user ever uses the Circumvention Devices or runs the SX OS on the Nintendo Switch or Nintendo Switch Lite, because, pursuant to the statute:

(a) The Circumvention Devices and accompanying SX OS are "primarily designed [and] produced for the purpose of circumventing" the Nintendo Switch's Technological Measures.

(b) The Circumvention Devices and accompanying software have "only limited" (if any) "commercially significant purpose[s] or use[s] other than to circumvent" the Nintendo Switch's Technological Measures.

(c) Defendants market the Circumvention Devices and accompanying software with knowledge that the Circumvention Devices and accompanying software are used to circumvent the Nintendo Switch's Technological Measures.  Further, Defendants act in concert with Team Xecuter, who also markets the Circumvention Devices and accompanying software with knowledge of their use in circumventing the Nintendo Switch's Technological Measures.

77.      While user infringement is not necessary to establish an anti-trafficking claim, on information and belief, the Circumvention Devices and SX OS are used primarily to play pirated video games and are facilitating massive copyright infringement of Nintendo's copyrighted works.

78.      The scale of potential harm from Defendants' trafficking in the SX Core and SX Lite is astounding, threatening the circumvention of the Technological Measures protecting more than 35 million additional Nintendo Switch and Nintendo Switch Lite consoles currently in the marketplace (on top of the 20 million pre-June 2018 Nintendo Switch consoles).  Team Xecuter's unlawful SX OS—installed with Defendants' Circumvention Devices—is the most-installed piracy software on the Nintendo Switch.  At its peak, SX OS accounted for 82% of Google searches for Nintendo Switch circumvention software, and was pre-installed on 97% of all modded/hacked Nintendo Switch products available for illegal sale.  Defendants' unlawful conduct must be stopped.

## COUNT ONE

### (Trafficking in Devices in Violation of 17 U.S.C. § 1201(a)(2))

79.     Plaintiff repeats and realleges every allegation contained in paragraphs 1 through 78 as if fully set forth herein.

80.     Section 1201(a)(2) of the DMCA, 17 U.S.C. § 1201(a)(2), prohibits the trafficking of devices that are primarily designed to circumvent technological protections that effectively control access to copyrighted works.  The statute provides, in pertinent part, that "[n]o person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act];

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under [the Copyright Act]; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under [the Copyright Act]."

81.     As discussed *supra*, ¶¶ 44−53, the Nintendo Switch's Technological Measures effectively control access to works protected by the Copyright Act, including the copyrighted operating system of the Nintendo Switch as well as Nintendo's video games playable thereon.

82.     As also discussed *supra*, the Nintendo Switch's Technological Measures require, in the ordinary course of their operation, the application of information, or a process or a treatment, with Nintendo's authority, to gain access to the Nintendo Switch console and any copyrighted games playable thereon.

83. Through UBERCHIPS.COM, Defendants offer to the public, provide, and otherwise traffic in devices and software that circumvent the Technological Measures on the Nintendo Switch, in violation of 17 U.S.C. § 1201(a)(2).

84. Each such offering to the public, provision, or other act of trafficking in each such Circumvention Device and accompanying software constitutes a violation of 17 U.S.C. § 1201 for which Nintendo is entitled to damages under 17 U.S.C. § 1203(c)(1), and injunctive relief under § 1203(b)(1).

85. Mr. Dilts is additionally directly liable for these acts of infringement under the Copyright Act pursuant to alter ego liability. There is a unity of interest and ownership of Uberchips, LLC and Mr. Dilts such that Uberchips, LLC is an alter ego of Mr. Dilts. On information and belief, Mr. Dilts is the founder and managing member of Uberchips, LLC. He directed Uberchips, LLC to engage in its infringing conduct, and he is the individual who has, on information and belief, the decision-making power to start, stop, or continue the infringing conduct. Mr. Dilts exerts domination and control over Uberchips, LLC, which is used as a mere shell for Mr. Dilts' actions. Additionally, on information and belief, Uberchips, LLC is inadequately capitalized, and operates out of Mr. Dilts' residence. Observance of the corporate form would lead to an inequitable result because it would sanction Mr. Dilts' misuse of the corporate form.

86. Defendants' acts are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.

87. As a direct and proximate result of Defendants' violations of 17 U.S.C. § 1201, Nintendo is entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 1203(c)(3)(A), in the amount of $2,500 with respect to each act of offering to the public, provision of, or otherwise trafficking in the Circumvention Devices, or such other amounts as may be proper

under 17 U.S.C. § 1201(c). In the alternative, pursuant to 17 U.S.C. § 1201(c)(2), Nintendo is entitled to its actual damages, as well as to Defendants' profits from these violations, in amounts to be proven at trial.

88. Nintendo is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 1203(b).

89. Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Nintendo great and irreparable injury for which there is no adequate remedy at law. Pursuant to 17 U.S.C. § 1203(b)(1), Nintendo is entitled to permanent injunctive relief prohibiting Defendants from engaging in further acts of offering to the public, providing, or otherwise trafficking in the Circumvention Devices and accompanying software.

## <u>COUNT TWO</u>

### (Trafficking in Devices in Violation of 17 U.S.C. § 1201(b)(1))

90. Plaintiff repeats and realleges every allegation contained in paragraphs 1 through 89 as if fully set forth herein.

91. Section 1201(b) of the DMCA, 17 U.S.C. § 1201(b), in a general sense, prohibits the trafficking in devices that are primarily designed to circumvent technological protection measures that protect against the unlawful copying of copyrighted works. The statute provides, in pertinent part, that "[n]o person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under [the Copyright Act] in a work or a portion thereof;

23

(B) has only limited commercially significant purpose or use other than to circumvent

protection afforded by a technological measure that effectively protects a right of a

copyright owner under [the Copyright Act] in a work or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person with that

person's knowledge for use in circumventing protection afforded by a technological

measure that effectively protects a right of a copyright owner under [the Copyright Act]

in a work or a portion thereof."

92.    As discussed *supra*, the Nintendo Switch's Technological Measures effectively

protect the rights of copyright owners in works protected by the Copyright Act.  These

copyrighted works include the Nintendo Switch operating system and Nintendo's video games

playable on the Nintendo Switch.

93.    As discussed *supra*, the Nintendo Switch's Technological Measures, in the

ordinary course of their operation, prevent, restrict, or otherwise limit the exercise of a right of a

copyright owner under the Copyright Act, by controlling or managing whether the Nintendo

Switch user may *copy* Nintendo's copyrighted works, and whether the user may *play*

unauthorized copies of Nintendo's copyrighted works on the Nintendo Switch.

94.    Through UBERCHIPS.COM, Defendants offer to the public, provide, and

otherwise traffic in devices and software that circumvent the Technological Measures on the

Nintendo Switch, which effectively protect Nintendo's rights in its copyrighted works, in

violation of 17 U.S.C. § 1201(b)(1).

95.    Each such offering to the public, provision, or other act of trafficking in each such

Circumvention Device and accompanying software constitutes a violation of 17 U.S.C. § 1201

for which Nintendo is entitled to damages under 17 U.S.C. § 1203(c) and injunctive relief under

§ 1203(b)(1).

96.     Mr. Dilts is additionally directly liable for these acts of infringement under the Copyright Act pursuant to alter ego liability.  There is a unity of interest and ownership of Uberchips, LLC and Mr. Dilts such that Uberchips, LLC is an alter ego of Mr. Dilts.  On information and belief, Mr. Dilts is the founder and managing member of Uberchips, LLC.  He directed Uberchips, LLC to engage in its infringing conduct, and he is the individual who has, on information and belief, the decision-making power to start, stop, or continue the infringing conduct.  Mr. Dilts exerts domination and control over Uberchips, LLC and Uberchips, LLC is used as a mere shell for Mr. Dilts' actions.  Additionally, on information and belief, Uberchips, LLC is inadequately capitalized, and operates out of Mr. Dilts' residence.  Observance of the corporate form would lead to an inequitable result because it would sanction Mr. Dilts' misuse of the corporate form.

97.     Defendants' acts are willful, intentional, purposeful, and in disregard of and indifferent to the rights of Plaintiff.

98.     As a direct and proximate result of Defendants' violations of 17 U.S.C. § 1201, Plaintiff is entitled to the maximum statutory damages, pursuant to 17 U.S.C. § 1203(c)(3)(A), in the amount of $2,500 with respect to each act of offering to the public, provision, or otherwise trafficking in the Circumvention Devices and software, or such other amounts as may be proper under 17 U.S.C. § 1201(c).  In the alternative, pursuant to 17 U.S.C. § 1203(c)(2), Nintendo is entitled to its actual damages, as well as to Defendants' profits from these violations, in amounts to be proven at trial.

99.     Nintendo is entitled to its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 1203(b).

100.    Defendants' conduct is causing and, unless enjoined by this Court, will continue to cause Nintendo great and irreparable injury for which there is no adequate remedy at law.

Pursuant to 17 U.S.C. § 1203(b)(1), Nintendo is entitled to permanent injunctive relief prohibiting Defendants from engaging in further acts of offering to the public, providing, or otherwise trafficking in circumvention devices and software.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For a declaration that Defendants' activities as alleged herein constitute violations of 17 U.S.C. § 1201.

2. For such equitable relief under Titles 17 and 28, and this Court's inherent equitable powers, as is necessary to prevent or restrain Defendants' further violations of 17 U.S.C. § 1201, including: (a) a permanent injunction prohibiting Defendants and their officers, agents, servants, employees, attorneys, and others in active concert or participation with any of them from: (i) offering to the public, providing, or otherwise trafficking in the Circumvention Devices—including the SX Core and SX Lite, accompanying SX OS software, and any other circumvention devices or software that target Nintendo or Nintendo's consoles or copyrighted works; or (ii) infringing, or causing, enabling, facilitating, encouraging, promoting, and inducing or participating in the infringement of, any of Plaintiff's copyrights protected by the Copyright Act, whether now in existence or hereafter created; (2) enjoining Defendants and all third parties with notice of the Order from supporting or facilitating access to any or all domain names, URLs, websites (including, without limitation, UBERCHIPS.COM), chatrooms, and other social media websites (including Facebook) or apps through which Defendants traffic in circumvention devices that threaten Plaintiff's Technological Measures or which infringe Plaintiff's rights under the Copyright Act; and (3) prohibiting Defendants from engaging in any other violation of the DMCA or Copyright Act, or any other federal or state law, as respects Nintendo.

3.　　　For entry of an Order, pursuant to Sections 502 and 1203 of the Copyright Act (17 U.S.C. §§ 502, 1203), 28 U.S.C. § 1651(a), and this Court's inherent equitable powers: (1) requiring Defendants and their officers, agents, servants, employees, attorneys, and others in active concert or participation with any of them: (a) to surrender, and cease to use, the domain name UBERCHIPS.COM, and any variant thereof controlled by Defendants; and (b) to immediately transfer the domain name UBERCHIPS.COM, and any variant thereof controlled by Defendants, to Plaintiff's control; and (2) enjoining Defendants and all third parties with notice of the Order from supporting or facilitating access to any or all domain names, URLs, and websites (including, without limitation, UBERCHIPS.COM) through which Defendants infringe Plaintiff's intellectual property rights and copyrights.

4.　　　An order pursuant to 17 U.S.C. § 1203 providing for the seizure, impoundment, and destruction of all Circumvention Devices, all copies of SX OS, and all other electronic material or physical devices within Defendants' custody, possession, or control—including any hard drives or other electronic storage devices containing such material—that violate Nintendo's rights under the DMCA or infringe upon copyrights owned or exclusively licensed by Nintendo.

5.　　　For entry of an Order requiring Defendants, within thirty (30) days after service of judgment with notice of entry thereof upon it, to file with the Court and serve upon Nintendo a written report under oath setting forth in detail the manner in which Defendants have complied with paragraphs 2, 3, and 4 of this Prayer for Relief.

6.　　　For an award of statutory damages pursuant to 17 U.S.C. § 1203(c) in the amount of $2,500 per violation of 17 U.S.C. § 1201, arising from Defendants' willful violations of the Anti-Trafficking provisions of the DMCA.  In the alternative, pursuant to 17 U.S.C. § 1203(c)(2), Nintendo may elect to receive actual damages as well as Defendants' profits from their violations of 17 U.S.C. § 1201, in amounts to be proven at trial.

7.     For an accounting, the imposition of a constructive trust, restitution of Defendants' unlawful proceeds from their violations of 17 U.S.C. § 1201, and damages according to proof.

8.     For Plaintiff's costs and reasonable attorneys' fees, pursuant to 17 U.S.C. § 1203(b).

9.     For prejudgment and post-judgment interest; and

10.    For such other relief as the Court may deem just and proper.

Dated:  May 15, 2020                        Respectfully submitted,

VORYS, SATER, SEYMOUR                       JENNER & BLOCK LLP
AND PEASE LLP


  _/s/ Kimberly Weber Herlihy_                  _/s/ Alison I. Stein_

Kimberly Weber Herlihy                      Alison I. Stein (*Application for Admission Pro*
Elizabeth S. Alexander                      *Hac Vice Forthcoming*)
52 East Gay Street                          Cayman C. Mitchell (*Application for Admission*
Columbus, OH 43215                          *Pro Hac Vice Forthcoming*)*
Telephone:  (614) 464-6400                  919 Third Avenue
Facsimile:  (614) 464-6350                  38th Floor
kwherlihy@vorys.com                         New York, NY 10022
esalexander@vorys.com                       Telephone:  (212) 891-1600
                                            Facsimile:  (212) 891-1699
                                            astein@jenner.com
                                            cmitchell@jenner.com

                                            Christopher S. Lindsay (*Application for*
                                            *Admission Pro Hac Vice Forthcoming*)
                                            633 West 5th Street
                                            Suite 3600
                                            Los Angeles, CA 90071
                                            Tel:  (213) 239-5100
                                            clindsay@jenner.com

                                            *Attorneys for Plaintiff Nintendo of America Inc.*




                                            *\*Admitted only in Massachusetts, not admitted*
                                            *in New York.  Practicing under the supervision*
                                            *of the partnership of Jenner & Block LLP*

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated:  May 15, 2020                    Respectfully submitted,

VORYS, SATER, SEYMOUR              JENNER & BLOCK LLP
AND PEASE LLP


  /s/ Kimberly Weber Herlihy                  /s/ Alison I. Stein

Kimberly Weber Herlihy              Alison I. Stein (*Application for Admission Pro*
Elizabeth S. Alexander              *Hac Vice Forthcoming*)
52 East Gay Street                  Cayman C. Mitchell (*Application for Admission*
Columbus, OH 43215                  *Pro Hac Vice Forthcoming*)*
Telephone:  (614) 464-6400          919 Third Avenue
Facsimile:  (614) 464-6350          38th Floor
kwherlihy@vorys.com                 New York, NY 10022
esalexander@vorys.com               Telephone:  (212) 891-1600
                                    Facsimile:  (212) 891-1699
                                    astein@jenner.com
                                    cmitchell@jenner.com

                                    Christopher S. Lindsay (*Application for*
                                    *Admission Pro Hac Vice Forthcoming*)
                                    633 West 5th Street
                                    Suite 3600
                                    Los Angeles, CA 90071
                                    Tel:  (213) 239-5100
                                    clindsay@jenner.com

                                    *Attorneys for Plaintiff Nintendo of America Inc.*



                                    *\*Admitted only in Massachusetts, not admitted*
                                    *in New York.  Practicing under the supervision*
                                    *of the partnership of Jenner & Block LLP*